**GUY et al. v. JONES et al.**

No. 5453.

Court of Civil Appeals of Texas. Texarkana.

Aug. 11, 1939.

Rehearing Denied Sept. 28, 1939.

Turner, Rodgers, Will & Sellers, Grover Sellers, and George S. Terry, all of Dallas, for appellants.

T. J. Ramey and Vern D. Adamson, both of Sulphur Springs, J. C. Muse and J. C. Muse, Jr., both of Dallas, J. C. Jackson and Chapman & Williams, all of Sulphur Springs, Hamlin Smithdeal, of Dallas, C. B. Randell, of Sherman, and Gamewell, O'Brien & Umphress, of Dallas, for appellees.

JOHNSON, Chief Justice.

Mrs. Beulah Guy, joined by her husband, O. L. Guy, filed this suit to recover an individed ½ interest in 33 tracts of land described in plaintiff's petition, and for conversion of certain personal property. The suit is against the executors and legatees named in the last will and testament of Mrs. Susan Belle Pierce, deceased, who was the widow of J. K. Pierce, deceased. Plaintiff claims to have inherited the ½ interest in the property sued for from J. K. Pierce, deceased. Plaintiff predicated her claim for recovery upon the plea that the defendants are estopped to deny that she had the status of an adopted child of J. K. Pierce. In addition to the statutory form of trespass to try title to the land and for conversion of the personal property she pleaded:

"That J. K. Pierce and Susan Belle Pierce, both deceased, in their lifetime took the plaintiff, Beulah Guy, from her natural father, George W. Brannon, when she was about three years of age, with the understanding and agreement between her natural father and the said J. K. Pierce or the said J. K. Pierce and Susan Belle Pierce that they would adopt said plaintiff and make her their adopted daughter; that said agreement was made by the father of the plaintiff for her benefit and in her behalf; that pursuant to said agreement and understanding, the natural father of plaintiff, Beulah Guy, delivered her to the said J. K. Pierce and Susan Belle Pierce, where she continued to live until she was grown and married; that the said J. K. Pierce and Susan Belle Pierce, at the time they took said plaintiff from her natural father, gave her the name of Beulah Pierce, and from thence on she was known as Beulah Pierce, and she was taught by them to call them 'Mammy' and 'Pappy' which she did until their death.

"It is further alleged that the said J. K. Pierce and Susan Belle Pierce held said plaintiff out to their friends as their daughter and as their adopted daughter, and on all occasions introduced her as their daughter and their adopted daughter. They fed, clothed and educated her, and she was known in the community at Sunday School, church and school by the name and only by the name of Beulah Pierce; that said plaintiff was kind and affectionate to the said J. K. Pierce and Susan Belle Pierce during all the time that she lived with them, waiting on them when they were sick and doing any and all kinds of work required of her by the said J. K. Pierce and Susan Belle Pierce, which work was such as was ordinarily required of children by their parents; that said plaintiff never at any time had any trouble with either the said J. K. Pierce or the said Susan Belle Pierce, but their relationship to said plaintiff was friendly and that of a mother and father toward her until their death long after this plaintiff was grown.

"It is further alleged that after the plaintiff, Beulah Guy, was grown and married to Professor O. L. Guy and after they had children of their own, their children called J. K. Pierce and Susan Belle Pierce 'Grandma' and 'Grandpa', and the said Susan Belle Pierce and J. K. Pierce called plaintiffs' children their grandchildren; that plaintiffs, after they were married, continued on good terms and friendly relations with J. K. Pierce and Susan Belle Pierce until their death; that only a short time prior to the death of J. K. Pierce he gave the plaintiff a home in the city of Sulphur Springs, Texas, on the express consideration of his love and affection for her and her children.

"It is further alleged that the said Susan Belle Pierce, who survived the said J. K. Pierce, continued to hold the plaintiff, Beulah Guy, out as their adopted daughter, and only a few years ago, in 1933, in relating her life history, stated that she and J. K. Pierce adopted the plaintiff, Beulah Guy, as their daughter.

"Wherefore, by virtue of each and all of the foregoing facts herein alleged, the defendants and each of them, are estopped to deny said plaintiffs status as the adopted daughter of the said J. K. Pierce, and are likewise estopped to deny that plaintiffs are entitled to recover upon their plea of conversion."

The defendants pleaded not guilty, the two, three, four, five, and ten year statutes of limitation, the statute of fraud, and as to the alleged conversion that plaintiff was estopped to assert any claim, by reason of her silence and conduct from the date of the death of J. K. Pierce on August 1, 1918, until after the death of Mrs. Susan Belle Pierce on February 2, 1937.

The case was tried to a jury. At the close of plaintiff's testimony the court on motion of defendants peremptorily instructed the jury to return a verdict for defend-

ants. Upon return of the verdict as directed, judgment was entered that plaintiff take nothing by reason of her suit. From an order overruling her motion for new trial plaintiff has perfected her appeal and assigned errors to the action of the trial court in directing a verdict for defendants.

The evidence shows that J. K. Pierce and 'Susan Belle Pierce were married in 1871 and began their wedded life with little or no property; that they lived in Hopkins County and accumulated a considerable amount of community property, both real and personal. No children were ever born unto J. K. and Susan Belle Pierce, or either of them. J. K. Pierce died intestate in 1918. Mrs. Pierce remained in possession of all of said property until her death in 1937, except that which it is alleged she converted or exchanged for other property. Mrs. Pierce left a will by which she disposed, or attempted to dispose of, all said property so accumulated by her and J. K. Pierce to certain legatees, named defendants in this suit.

In 1884, when plaintiff, Mrs. Beulah Guy, was about three years of age, she was surrendered to Mr. and Mrs. Pierce and they took her into their home under agreement with Beulah's father, George Brannon, whereby he gave the child to them, relinquishing all rights and claims to her, on their promise to adopt the child and rear her as their adopted daughter. There is very little testimony concerning Beulah's blood relatives. It appears that in addition to her father she had one sister living at the time she was taken into the home of Mr. and Mrs. Pierce. Her father, George Brannon, lived near the little community of Haggansport, not far from Sulphur Bluff where Mr. and Mrs. Pierce resided. He died in 1909 and was buried at Paint Rock, Texas. Beulah lived with Mr. and Mrs. Pierce as their adopted daughter after she was taken into their home until she married O. L. Guy in 1897, at the age of about seventeen years. Mr. and Mrs. Pierce's custody and control of Beulah was never interfered with by George Brannon or any one else after the time she was taken into their home. At times after her marriage, Beulah and her husband, O. L. Guy, lived in the home with Mr. and Mrs. Pierce while Mr. Guy taught school in the community. It appears without question that after Beulah was taken into their home she faithfully, affectionately and in a com-

plete measure performed every duty unto Mr. and Mrs. Pierce due by an obedient daughter to her parents, continuously until her marriage and then afterwards until the respective ·deaths of Mr. and Mrs. Pierce. She was taught to and did refer to them as father and mother, and her children were taught to and did refer to Mr. and Mrs. Pierce as grandfather and grandmother. It also appears that Mr. and Mrs. Pierce were kind and affectionate to Beulah, and from the time they took Beulah into their home to the dates of their respective deaths represented to their friends, their neighbors, and to the public that they had adopted her and referred to her as their daughter, or adopted daughter.

The witness Jim Mote who resided and still resides near Haggansport, not far from where George Brannon lived, testified that he saw J. K. Pierce on the day he was returning home from George Brannon's with the child, Beulah, on horseback with him; and on that day when he had not yet reached his home with the child, J K. Pierce in the witness' presence explained his possession of the child by saying he was "taking the child to raise and was going to adopt her." To others of his friends J. K. Pierce made a more detailed account of the agreement which resulted in his possession of Beulah. He told J. K. Maxwell, an intimate acquaintance, that he "begged him (George Brannon) to let him take the child and raise it and adopt it as his child." To the same effect is testimony given by J. H. Clifton, an intimate friend of the Pierces. He testified as follows: "He (J. K. Pierce) said he wouldn't take her unless they (Mr. and Mrs. J. K. Pierce) adopted her; he said Mr. Brannon had two girls and wanted him to take both and he didn't want· but one, and said he wouldn't take her unless he adopted her." To Felix Patterson, a local Justice of the Peace, Mr. Pierce made a further explanation when asked by Patterson where he got the child: "Well, I got her· from an old man down the country. * * * I thought I wasn't going to get her, but I told him that he had to relinquish all rights, title and claims to her and turn her over to me for adoption." The testimony shows that Mrs. Pierce was likewise interested in the adoption of the child, as shown by the testimony of the witness Flonnie Bassham who testified as follows: "She (Mrs. Pierce) was telling all the time when she took Mrs. Guy and said she told Mrs. Guy's father if he would give Mrs. Guy to them and let them adopt her, they

would take her, otherwise she would not, she was afraid he would come back and take her away from them sometime."

Many witnesses, neighbors and acquaintances of Mr. and Mrs. Pierce testified that both Mr. and Mrs. Pierce represented to the public and to their friends generally that Beulah was their child, or adopted child, the representations occurring by introduction of and reference to the child, and on such occasions as the matter of their relation to the child presented itself, covering the period of time from their taking of the child unto the dates of their respective deaths, a period of more than forty years; and they referred to Beulah's children as their grandchildren. The testimony also shows that Beulah performed her duties in the Pierce home just as a daughter of their own blood. She attended school and regularly went with the Pierces to church and Sunday school; and she was known only by the name of Beulah Pierce. The witness Sadie Malone testified: "She worked in the home like any other child." J. H. Clifton testified that he "saw her doing work in the place * * * just the regular house duties." Lucy and Dollie Carpenter testified that Beulah waited on Mrs. Pierce when she was sick; that she worked in the home; that she picked (cotton) bolls and picked burrs out of the wool of sheep; that she did the housework, and was ever obedient. Mary Etta Holly also testified that she was obedient. J. H. Maxwell testified that she did work just like any other child. In brief, it may be said that the testimony as a whole shows that Mr. and Mrs. Pierce received and kept the child under promise to adopt her, that throughout their lives Mr. and Mrs. Pierce, representing that they had adopted the child, received all the benefits and privileges of that relationship, faithfully performed by Beulah under the belief on her part that she had been adopted by them. But it now appears that neither Mr. nor Mrs. Pierce filed (or executed) any instrument of adoption with the county clerk as prescribed by R.S.1925, Article 42, in force at that time, which was essential to constitute a valid legal adoption.

■■ The facts of this case clearly fall within the rule which our Supreme Court in Cubley v. Barbee, 123 Tex. 411, 73 S.W. 2d 72, 79, has declared to be the correct rule, namely: "It seems to us that the rule is correctly stated by the annotator in the notes to the case of In re Taggart's Estate, 27 A.L.R. page 1365, where the writer states: 'The cases considering the matter are in substantial harmony in sustaining an estoppel in pais to preclude adoptive parents and their privies from asserting the invalidity of adoption proceedings, or, at least, the status of the adopted child, when, by performance upon the part of the child, the adoptive parents have received all the benefits and privileges accruing from such performance, and they by their representations induced such performance under the belief of the existence of the status of adopted child.' Holloway v. Jones (Mo. Sup.) 246 S.W. 587; Young v. McClannahan, 187 Iowa 1184, 175 N.W. 26; Fiske v. Lawton, 124 Minn. 85, 144 N.W. 455; Jones v. Leeds, 41 Ind.App. 164, 83 N.E. 526; Anderson v. Blakesly, 155 Iowa 430, 136 N.W. 210; Barney v. Hutchinson, 25 N.M. 82, 177 P. 890; In re Reichel, 148 Minn. 433, 182 N.W. 517, 16 A.L.R. 1016; Milligan v. McLaughlin, 94 Neb. 171, 142 N.W. 675, 46 L.R.A.,N.S., 1134; Wolf's Appeal (Pa.) 13 A. 760, 10 Sad. 139; In re Williams' Estate, 102 Cal. 70, 36 P. 407, 41 Am.St.Rep. 163; In re McKeag's Estate, 141 Cal. 403, 74 P. 1039, 99 Am.St.Rep. 80; [note to] Carlin v. Bacon, 69 A.L.R. 17; Tuttle v. Winchell, 104 Neb. 750, 178 N.W. 755, 11 A.L.R. 814; Horton v. Troll, 183 Mo.App. 677, 167 S.W. 1081; Thomas v Maloney, 142 Mo.App. 193, 126 S.W. 522."

Appellees, in substance, contend that the above quoted rule granting relief through the equitable remedy of estoppel has no application and the relief can not be granted except in cases where it is shown that the adoptive parent has executed and acknowledged a deed of adoption, but has failed to record it. The testimony in the Cubley case shows that the adoptive parent had there executed and acknowledged an instrument as part of the agreement under which the child was taken, which the Court of Civil Appeals, Barbee v. Cubley, 25 S.W. 2d 689, construed as being testamentary in character, and concerning which instrument the Supreme Court held that the adoptive parent by her acts and representations was estopped to deny that it was a deed of adoption. But the doctrine of equity upon which decision in the Cubley case was based does not rest upon execution of the adoption deed. It rests upon the adoptive parent having received the benefits of the relation fully performed by the child. The language of the rule

itself as declared in the Cubley case, as well as the authorities there cited from which the rule is drawn, clearly shows that exercise of the equitable power of the court to grant relief to the child, against the fraud of the adoptive parents' neglect or design in failing to do that which he in equity was obligated to do, is not dependent or conditioned upon such adoptive parents having executed but failed to file an instrument of adoption. The first case cited by the court in support of the rule declared in the Cubley case is Holloway v. Jones, Mo.Sup., 246 S.W. 587, in which the relief was granted though the adoptive parent "never executed the deed of adoption." The following statement of that case, and excerpt from the opinion, clearly illustrates the error of appellees' contention in the present case:

"In Holloway v. Jones, 246 S.W. 587, 590, the Supreme Court of Missouri sustained the rights of a person taken, while an infant, into the family of McHaney and wife, under a promise on the part of the latter to adopt it. We shall not state the facts, as the case is available. It is sufficient to say that the child performed all the duties of a child to its adopting parents. The latter, however, never executed the deed of adoption. The suit was between the child after the deaths of the McHaneys and a collateral relative. The Supreme Court sustained the claim of the child. The adoption statutes of Missouri were quite similar to our own. * * *

"'In all these cases it is held, in substance, that one who takes a child into his home as his own, receiving the benefits accruing to him on account of that relation, assumes the duties and burdens incident thereto, and that where justice and good faith require it the court will enforce the rights incident to the statutory relation of adoption. The child having performed all the duties pertaining to that relation, the adopting parent will be estopped in equity from denying that he assumed the corresponding obligation. In equity it will be presumed that he did everything which honesty and good conscience required of him in justification of his course. Equity follows the law except in those matters which entitle the party to equitable relief, although the strict rule of law be to the contrary. It is at this point that their paths diverge. As the archer bends his bow that he may send the arrow straight to the mark, so equity bends the letter of the law to accomplish the object of its enactment. In all the cases to which we have referred supra, and in numerous others, this court has consistently held that he who has taken possession of a child in the capacity of an adopting parent cannot escape the duties and liabilities incident to that capacity by failing to follow the forms that the statute has prescribed to that end.'"

■ Among others, appellees cite the following cases: Sanders v. Lane, Tex. Com.App., 227 S.W. 946; Allee v. Vaden, Tex.Civ.App., 112 S.W.2d 237; Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216; Cheney v. Coffey, 131 Tex. 212, 113 S.W.2d 162, 114 S.W.2d 533; Upson v. Fitzgerald, 129 Tex. 211, 103 S.W. 2d 147. The rule declared in the Cubley case, and which we have followed in this case, is not in conflict with any of the above cited cases, the distinction lies in the remedy pursued by the claimant. The apparent confusion may be clarified by the following classification of remedies attempted to be pursued for recovery of a decedent's estate.

(a) Straight statutory adoption. This classification under the statute, R.S.1925, Article 42, required three steps of the adoptor: (1) execution, (2) acknowledgment, and (3) filing for record the deed of adoption. This is the adoption referred to in the following cases: Sanders v. Lane, supra, and Allee v. Vaden, supra.

(b) Suits for specific performance of contract to leave property at death. This type of contract when entered into in parol has frequently fallen under the ban of the statute of fraud in Texas. It is best illustrated in the following cases: Hooks v. Bridgewater, supra, and Cheney v. Coffey, supra, and Upson v. Fitzgerald, supra.

(c) Estoppel to deny adoption of a child. Among the cases recognizing this remedy are: Cubley v. Barbee, supra, Holloway v. Jones, and the more recent case of Thompson v. Moseley, Mo.Sup., 125 S.W.2d 860. Also the remedy is recognized in Cheney v. Coffey, supra.

The cases bearing upon this subject are more minutely distinguished by the Honorable Ben H. Powell, Jr., in the April, 1939 issue of the Texas Law Review, from which we quote the following as most pertinent to the point here under consideration:

"If the child lives with the promisor (adoptive parent) and discharges the filial obligations until the promisor's death, according to most American courts there has been sufficient part performance to take either an oral promise to adopt or an oral promise to devise property out of the Statute of Frauds. But in Texas it seems that a distinction must be drawn between a promise to adopt and a promise to devise property.

"In Hooks v. Bridgewater [supra], the Texas court held that the performance by the child of all his obligations was not sufficient part performance to take an oral promise to devise property out of the Statute. The holding has been followed, and the strict rule of part performance laid down in that case has been repeatedly sanctioned. Our Texas courts only twice have been confronted with the contention that an oral promise to adopt should be unenforceable by the child because within the Statute of Frauds even where there had been unequivocal part performance of the promise. In Cubley v. Barbee [supra], attempted adoption proved ineffective, but the foster parent repeatedly had stated that the child, who was fulfilling all his filial obligations, had been legally adopted. Although the Texas court of last resort enforced the agreement to adopt upon the basis of estoppel, as has been done in other jurisdictions, the court recognized the existence of other grounds for relief. (Quoting from Cubley v. Barbee: 'In many jurisdictions relief has been granted to those in positions analogous to that of Jesse Cubley here, by decrees of specific performance. * * * This seems also to be an available remedy in this state. 1 Texas Jurisprudence, 728, § 16. However, we are of the opinion that the real classification of the remedy is that of estoppel.') Recently a case involving a similar fact situation came before the Commission of Appeals, and although the court could not directly pass upon the validity of a partly performed oral agreement to adopt, since this agreement had not been properly plead, the Commission did discuss the rights arising out of such a contract. (Cheney v. Coffey [131 Tex. 212], 113 S.W.2d 162, rehearing denied 114 S.W.2d 533). The court aligned Texas with the majority of American jurisdictions by saying that such an oral contract may be taken out of the Statute of Frauds where the proof of part performance is clear and unequivocal and clearly referable to the contract. It is reasonable to conclude that the Commission in remanding the case felt that the child by faithfully performing all the obligations incident to the adoptive status had satisfied the requirement of part performance. Thus the court apparently is sanctioning the giving of relief in such a situation, rather than following the requirements laid down in Hooks v. Bridgewater, whereby the large amount of part performance required in effect denies the remedy. Therefore it appears that both the oral promise to leave property to the child and the parol agreement to adopt the child are within the section of the Statute of Frauds relating to oral contracts involving the sale of land; however, the Texas courts in effect will not take the former promise out of the Statute even though it has been subjected to the usual amount of part performance, whereas our courts under such circumstances will take the agreement to adopt out of the Statute and enforce it." (Parenthetical matter our quotation.)

The judgment of the trial court will be reversed and the cause remanded.